IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRENT JACOBY, #291560 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:15-cv-367-MHT |
| | ) | [WO] |
| COMMISSIONER THOMAS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION

Plaintiff Brent Jacoby is an inmate of the Alabama Department of Corrections ("ADOC"). He filed this 42 U.S.C. § 1983 action alleging that prison officials at Ventress Correctional Facility ("Ventress") in Clayton, Alabama failed to protect him from assault by fellow inmate Kenneth Palmore in May 2014, failed to have an adequate grievance system, and violated his due process rights. Docs. 1, 36 & 37. Plaintiff names as defendants[1] Kim T. Thomas, James Carlton, Dorothy Scott, Brian Gordon, James Nolin, Keone Curry, Jimmy Spann, Pamela Harris, and Camelia Cargle. Doc. 1. Plaintiff sues Defendants in their official and individual capacities. Doc. 1 at 12. Plaintiff requests injunctive relief and damages. Doc. 1 at 1 & 12.

---

[1] Plaintiff previously dismissed two defendants, Lt. Bennett and Christopher Gordy. Docs. 52 & 53. In addition, Plaintiff spelled Nolin's name as "Nolan" and Spann's name as "Span," but these defendants have appeared and have provided the correct spellings for their names. Docs. 24 & 42. The Clerk of the Court is DIRECTED to correct Plaintiff's misspellings on the court's docket.

Defendants filed an answer, special report, supplemental answer and special report, and evidentiary materials addressing Plaintiff's claims for relief. Docs. 23, 24, 41 & 42. Upon receipt of Defendants' reports, the court directed Plaintiff to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Plaintiff that "at some time in the future the court will treat Defendants' reports and Plaintiff's response as a dispositive motion and response." Doc. 43 at 1. Plaintiff responded to Defendants' reports and materials. Docs. 31 & 51.

The court now will treat Defendants' reports as a motion for summary judgment. Upon consideration of the motion, the responses, and the evidentiary materials filed in support and in opposition to the motion, the court concludes that Defendants' motion for summary judgment is due to be GRANTED.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery

2

materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating that there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that the court should consider facts pled in a plaintiff's sworn complaint when considering summary judgment). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting

the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant, materiality is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . 'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'") (citation omitted). "Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact). Although factual inferences must be viewed in a light most favorable to the nonmoving

4

party and *pro se* complaints are entitled to liberal interpretation by the court, a *pro se* litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's *pro se* status alone does not mandate that this court disregard elementary principles of production and proof in a civil case. Here, Plaintiff fails to demonstrate a requisite genuine dispute of material fact so as to preclude summary judgment on his claims against Defendants. *See Matsushita*, 475 U.S. at 587.

### III. DISCUSSION

**A.     Absolute Immunity**

Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. Doc. 24 at 12. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). State officials may not be sued in their official capacities for money damages unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity, and neither has occurred in this case. *See Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996) (discussing abrogation by Congress); *Pennhurst St. School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (finding that Alabama has not waived Eleventh Amendment immunity)). In light of the foregoing, Defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for Plaintiff's claims

seeking monetary damages from them in their official capacities. The claims for money damages brought against Defendants in their official capacities are therefore due to be dismissed.

## B.    Equitable Relief

Plaintiff's request for injunctive relief against Defendants is due to be dismissed as moot because Plaintiff is now located at Kilby Correctional Facility and is longer incarcerated at Ventress. Doc. 60. The transfer or release of a prisoner renders moot any claims for injunctive or declaratory relief. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (holding that past exposure to illegal conduct does not in and of itself prove a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury). Consequently, Plaintiff's request for equitable relief is moot.

## C.    Lack of Grievance Procedure

Plaintiff complains that the inmate grievance system violated the First Amendment. Doc. 1 at 4. Plaintiff also states that the "facility is notorious for ignoring grievances," not handing out grievance forms, and other wrongs related to the grievance system. Doc. 1 at 8. To the extent Plaintiff's complaint about the grievance system is related to his Eighth Amendment claim regarding the inmate assault, the court will address his allegations regarding the grievance system along with Plaintiff's Eighth Amendment failure to protect claim. Plaintiff's First Amendment claim that the grievance system is inadequate lacks

6

merit because "a prisoner does not have a constitutionally-protected liberty interest in an inmate grievance procedure." *Thomas v. Warner*, 237 F. App'x 435, 437 (11th Cir. 2007) (citing *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)); *see also Flowers v. Tate*, 925 F.2d 1463 (6th Cir. 1991) (holding that an inmate "does not have a constitutional right to an effective grievance procedure"). Thus, the quality of the inmate grievance procedure, standing alone, does not provide a basis for relief in this cause of action, and Defendants are due to be granted summary judgment on Plaintiff's claim regarding the grievance system.

**D.   Deliberate Indifference**

Plaintiff claims that Defendants were deliberately indifferent to his safety when they failed to protect him from assault by inmate Palmore on May 31, 2014. Doc. 1 at 5. Defendants assert they are entitled to qualified immunity on Plaintiff's claims against them in their individual capacities for monetary damages. Doc. 24 at 2 & 4–10. They further argue that they cannot be held liable based on vicarious liability. Doc. 24 at 10–12. Finally, they argue that, pursuant to 42 U.S.C. § 1997e(e), Plaintiff cannot recover money damages because his physical injuries were *de minimis*. Doc. 24 at 11–12. The court begins its analysis with Defendants' argument for qualified immunity.

*1.   Qualified Immunity*

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have

known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that Defendants here were acting within the course and scope of their discretionary authority when the incidents occurred. Plaintiff must, therefore, allege facts that, when read in a light most favorable to him, show that Defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). "Clearly established law" means (1) "a materially similar case has already been decided"; (2) "a broader, clearly established principle that should control the

novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (11th Cir. 2017) (quotation marks and citations omitted). The controlling authority is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." *See id.* at 1209. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). The Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210. "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). If a plaintiff cannot establish both elements to satisfy his burden, the defendants are entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241–42).

### 2.    *Summary of Material Facts*

For purposes of considering Defendants' motion for summary judgment, the court views the facts in the light most favorable to Plaintiff, the nonmoving party. Plaintiff was an inmate at Ventress in 2014. During the time relevant to his claims, Thomas was the ADOC Commissioner. Gordon was the ADOC Prison Rape Elimination Act ("PREA")

Compliance Manager. At Ventress, Carlton was a Warden, Scott was a Lieutenant, Nolin was a Sergeant, Cargle and Harris were Captains, and Curry and Spann were Correctional Officers. Docs. 24-2, 24-3, 24-4, 24-5, 42-1, 42-3, 42-5, 42-6 & 42-7.

Plaintiff's failure to protect claim centers on two incidents on May 31, 2014, the second of which was Palmore's physical attack on Plaintiff. Doc. 51 at 3. In his verified complaint, Plaintiff states that he is a bisexual white male. Doc. 1 at 5. Plaintiff is "very feminine" and "at a greater risk of harm than other inmates." Doc. 51 at 6. In May 2014, he was housed in Dorm 1 along with inmate Palmore. Doc. 51 at 6. Plaintiff alleges that Palmore "has a reputation for being a violent assaultive inmate and for having sexually assaulting and harassing other inmates at other prisons and has this on his disciplinary record." Doc. 51 at 6. Palmore had two previous PREA complaints against him at a different institution. Doc. 42-5 at 3 & 5. Plaintiff states that Palmore wanted to be in a homosexual relationship with Plaintiff, and for about two weeks "Palmore would not take rejection from" Plaintiff and instead tried to intimidate Plaintiff or offer Plaintiff money for sexual favors. Doc. 1 at 5.

### a.    First Incident

After Plaintiff refused his advances, Palmore told Plaintiff on May 31, 2014 that "bitch I'm gonna kill you, you['re] always gonna be mine," and then Palmore opened Plaintiff's lock box, taking Plaintiff's cigarettes, lock, and key, and telling him, "you want it come get it." Doc. 1 at 6. Plaintiff began having an anxiety attack, could not breathe, and began crying out of fear, frustration, and humiliation. Doc. 1 at 6. He ran out the door and

reported the incident to Officer Curry, and specifically invoked PREA. *Id.* Plaintiff states he "reported everything" to Curry, Nolin, Scott, "& or Bennett."[2] Doc. 1 at 6. Palmore admitted to Nolin that he took Plaintiff's property, and according to Plaintiff, also told Nolin "that's my girlfriend." Doc. 1 at 6. Plaintiff states that he was not in a relationship with Palmore and instead was in a relationship with inmate Aloysius Henry. Doc. 1 at 6. Plaintiff submitted a statement from Henry in which Henry maintains that he "was in a homosexual relationship with Mr. Jacoby at the time Palmore was trying to break us up." Doc. 51-1 at 2. Nolin retrieved Plaintiff's things from Palmore and moved Palmore to Dorm C but did not lock up Palmore. Doc. 1 at 6.

Plaintiff alleges that Captain Cargle, Sergeant Nolin, and Lieutenant Scott ignored their own policies and moved Palmore to the dorm next door instead of segregating him. Doc. 51 at 4. According to Plaintiff, PREA rules[3] require the officers to lock up Palmore pending an investigation of the theft of Plaintiff's property. Doc. 51 at 4. Plaintiff went to Cargle, Scott, Nolin, and Gordon for help, but they did not take Plaintiff seriously and instead ignored his safety "until [Palmore] got a chance to almost kill" him. Doc. 51 at 5. Plaintiff further claims that "no video surveillance is in place and inmates are obviously free to roam wherever they please and constantly get away with acts of violence and smuggle in contraband [a lot] easier because of this." Doc. 51 at 5. Thomas, Carlton, and Harris "are policymakers and in charge of day to day operations but yet have chose[n] to

---

[2] Bennett has been dismissed as a defendant. Doc. 53.
[3] The complete PREA rules are not part of the summary judgment record.

do nothing to fix the problems." Doc. 51 at 7–8.

Correctional Officer Curry confirms that he was assigned to Dorm D during the incident. Doc. 24-2 at 1. Curry saw Plaintiff and Palmore "in a loud verbal altercation inside the lobby area of Dormitory D." Doc. 24-2 at 1. Curry ordered the inmates to step away from one another, and they complied. Doc. 24-2 at 1. Plaintiff said Palmore had stolen Plaintiff's lock. Doc. 24-2 at 1. Curry radioed Nolin and reported the incident to Nolin when he arrived. Doc. 24-2 at 2. Jacoby received a disciplinary report for disorderly conduct. Doc. 24-2 at 2. Curry does not remember that Plaintiff reported any PREA incidents to him. Doc. 24-2 at 2.

Sergeant Nolin avers that, as with any PREA incident, he is "to report the incident to a higher official. I reported this incident up the chain as I do with any incident. The decision to place an inmate in segregation or move them to another dormitory is made at a higher rank than I possess." Doc. 24-3 at 1. Nolin states that, "according to Administrative Regulation 454; Section V.D.3.a. . . . the shift supervisor shall ensure that the victim(s), aggressors(s) and witnesses are physically separated." Doc. 24-3 at 1–2. As a result, Palmore was moved from Dorm D to Dorm C, and Plaintiff remained in Dorm C, so the victim and aggressor were physically separate. Doc. 24-3 at 2. On this basis, Nolin claims that he "followed all procedures as they are prescribed to me." Doc. 24-3 at 2. According to an incident report Nolin prepared regarding the first incident, Cargle was the On-Duty Call Official on May 31, 2014, although the report does not identify who decided to move Palmore to a different dorm instead of segregating him in lockup. Doc. 24-1 at 2–3.

According to Nolin's incident report, at about 4:45 a.m. on May 31, 2014, in Dorm D, Curry saw Plaintiff and Palmore engaging in a loud verbal altercation in front of the dorm. Doc. 24-1 at 2. Curry separated the inmates and called for Nolin. Plaintiff told the officers that Palmore had been sexually harassing Plaintiff and following him, that Plaintiff told Palmore no, that the incident started with Palmore taking Plaintiff's lock that morning, and the Plaintiff said that "(3) packs of my tops are missing and he's wearing my boots. When I go in the shower he comes in the shower. He follows me in the bathroom. I'm scared of him." Doc. 24-1 at 2. According to the report, Palmore told Nolin:

> We've been looking out for each other for a while. We had a disagreement. We never put hands on each other. I haven't been sexually harassing him. He was hanging out on my rack earlier asking what we gonna do. I told him I don't wanna do anything. That's when he got upset and told me that he had been waiting on me all night and that he could have been doing something else. I had given him five (5) Tops. I told him to give me the Tops back. He said that he didn't feel like he owed me anything. I took his lock as payment.

Doc. 24-1 at 2. Nolin also spoke with other inmates who said Plaintiff and Palmore were in a relationship, and Plaintiff got some items from Palmore and was trying to get moved out of the dorm so Plaintiff did not have to pay Palmore for the items. Doc. 24-1 at 2. Curry reported that he saw Plaintiff sitting on Palmore's bed earlier that day, and they seemed fine, but after Curry called for mealtime, "they went out the door and got into an argument." Doc. 24-1 at 2. The report refers to medical body charts prepared for Plaintiff and Palmore, but no body chart is attached to the first report. Doc. 24-1 at 2. Nolin notified Gordon, the PREA coordinator of the incident. Doc. 24-1 at 2–3. Palmore was moved to another dorm pending an investigation. Doc. 24-1 at 3. Nolin's report does not indicate who made the

decision to move Palmore, but does show that the inmates were "pending Disciplinary action for Disorderly Conduct" as a result of the incident. Doc. 24-1 at 3.

Lieutenant Scott did not witness the first May 31, 2014 altercation between Palmore and Plaintiff, but was notified about it from subordinate officers. Doc. 42-7 at 1. At about 6:00 a.m., Scott told her supervisor, Cargle, about the incident, and the inmates "were separated into separate population dorms while the incident was investigated. Doc. 42-7 at 1. The PREA coordinator was notified based on the nature of Plaintiff's allegations. Doc. 42-7 at 1. Scott was unaware of prior conflict between Plaintiff and Palmore. She does not recall the incident that happened later in the morning on May 31, 2014, or whether she was even on duty, and she states that Plaintiff makes no specific allegations against her regarding the second incident. Doc. 42-7 at 1. Scott does not recall receiving any complaints or request slips from Plaintiff regarding Palmore before or after the incident. Doc. 42-7 at 2.

Cargle was the On-Call Duty Official on May 31, 2014. Doc. 42-6. In her affidavit, she does not address the earlier incident on May 31, 2014. In particular, Cargle does not indicate that she was the one who, as the on-duty officer, decided to move Palmore to another dorm instead of segregate him.

### b.    Second Incident

Plaintiff alleges that he was asleep a few hours after the first incident on May 31, 2014 when Spann allowed Palmore to return to Plaintiff's dorm without permission. Doc. 1 at 6. At that time, Palmore punched and kicked Plaintiff. Doc. 1 at 6. Plaintiff "woke up

on the floor with 2 swollen black eyes, busted face with blood dripping everywhere from his cuts on his cheek and lip and he had knots on is head and a bruised crack rib." Doc. 1 at 6. In an unsworn statement, Plaintiff claims that the dorms should have been locked, but Spann failed to lock them, allowing "Palmore to sneak/walk in unannounced and savagely beat Jacoby."[4] Doc. 31 at 5.

> According to Henry:
>
> I was awake talking to Officer Span[n] in front of the sports T.V. when Palmore walked by me and Span[n] to Jacoby's bed without permission and started beating on him while he was sleeping. By the time we got to Jacoby, Palmore had ran back to his own dorm and Jacoby ran after him crying and yelling for officers to stop him but due to the lack of staffing and unsafe environment this was able to happen because the dorms were not secure as they should have been. Had PREA and Cpt. Cargle locked Palmore up as policy requires, this would not have happened.

Doc. 51-1 at 2.

> Spann admits that he was assigned to the yard as Dorm D Rover, although he does not recall the specific date. Doc. 24-4 at 1. Spann recalls:
>
> On that day, Dorm D had yard call at some point of time, I, Officer Spann was standing on Dorm D front porch watching the inmates on the yard. I, Officer Spann turned and went to D4 side to check and see what the Segregation inmate wanted and then I returned to the front porch of Dorm D. At some point, Inmate Brent Jacoby came out of Dorm D walking to Dorm C, I, Officer Spann ordered inmate Jacoby to stop. Inmate Jacoby hesitated but stopped and said inmate Kenneth Palmore had hit him and took his watch. I, Officer Spann reported the incident to the Shift Supervisor, Sergeant James

---

[4] "Unsworn statements 'do[] not meet the requirements of Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion." *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970)). Under Fed. R. Civ. P. 56(e)(2) and (4), however, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed" or "issue any other appropriate order." For purposes of this recommendation, the court treats as undisputed Plaintiff's statement that the dormitory doors should have been locked per institutional policy.

> Nolin. I, Officer Spann did not let inmate Palmore in the Dorm, inmate Palmore did admit later to Officer Jimmy Spann that he waited until Officer Spann went back into the dorm to slip in to the dorm.
>
> This is my involvement with inmate Brent Jacoby, #291560 and this incident.

Doc. 24-4 at 1. The second incident report from May 31, 2014, was prepared by Sergeant Tawanda Rhymes and confirms that Spann was assigned as Dorm D Rover that day. Doc. 24-1 at 4. The report states, "At approximately 8:55 am, Officer Spann observed Inmate Brent Jacoby, W/291560, run out of Dormitory D towards Dormitory C with a swollen eye and scratches on his face. Officer Spann advised Sergeant Tawanda Rhymes of the incident via hand-held radio." Doc. 24-1 at 4. Spann is not mentioned in the report after this event.

Instead, according to the report, Officer Dorein Robbins then "had Inmate Jacoby on Dormitory C Porch." Doc. 24-1 at 4. As Rhymes approached, Plaintiff ran inside Dorm C, and Robbins ordered Plaintiff to stop and lie down to be cuffed. Doc. 24-1 at 4. After Plaintiff was secured, he said he ran to Dorm C because Palmore assaulted Plaintiff and "this is where he sleeps. I just wanted to know why he came and did this to me." Doc. 24-1 at 4. Rhymes instructed Robbins to bring Palmore to the lobby, where he was questioned. Doc. 24-1 at 4. At about 9:00 a.m., Rhymes escorted Plaintiff to the Health Care Unit, where Nurse Guilford treated Plaintiff and released him back to the ADOC. Doc. 24-1 at 4. At about 10:30 a.m., Rhymes notified the "the On-Call Duty Official," Cargle, and at about 10:40 a.m., Rhymes notified Gordon. Doc. 24-1 at 4. Rhymes then questioned Palmore again, and Palmore admitting beating Plaintiff. Doc. 24-1 at 5.

Attached to the second Incident Report is a medical body chart Nurse Guilford

prepared at 9:30 a.m. on May 31, 2014. Doc. 24-1 at 6. The nurse identified abrasion areas to the right and left sides of Plaintiff's head, right lower side, right mid-back, left jaw, an old abrasion to his right mid-leg, and left side of chin. Doc. 24-1 at 6. She observed a purple discoloration with laceration under his right eye, redness to left shoulder, back of right arm, left side of back, and center of chest. She observed a scratch area on the left side of his face above the lip to the left cheek area, back of neck, and to left "ac." Doc. 24-1 at 6. Plaintiff denied dizziness or blurred vision and rated his pain at an eight. She noted red drainage underneath his left eye and treated the area. Doc. 24-1 at 6. The nurse returned him to the ADOC with instructions to sign up for sick call with any problems. Doc. 24-1 at 6. The medical notes do not indicate any broken or bruised bones. Doc. 24-1 at 6.

Gordon interviewed Plaintiff about the incidents on June 3, 2014. Doc. 42-5. Gordon determined Plaintiff's allegations against Palmore to be unsubstantiated. Doc. 42-5 at 5. Nevertheless, Gordon asked that Palmore and Plaintiff be listed as enemies and that one of them be transferred. Doc. 42-5 at 5.

Plaintiff and Palmore were disciplined with segregation for disorderly conduct. Doc. 1 at 7. About a week after Plaintiff was released, Harris asked Plaintiff to sign a "living agreement" stating he could live peacefully with Palmore, so that Palmore could be released from lockup. Doc. 1 at 8. Palmore still had about 45 days of lockup to serve. Doc. 1 at 8. At first, Plaintiff refused to sign the agreement because "he didn't feel safe with Palmore running around. Cpt. Harris locked [Plaintiff] back up in the disciplinary dorm and let Palmore out." Doc. 1 at 8. Plaintiff's mother called to complain, and Plaintiff

17

borrowed another inmate's cell phone to call Carlton. Doc. 1 at 8. Plaintiff pretended to be a lawyer and threatened to file a lawsuit if Plaintiff were not released from lockup, and afterward Harris released Plaintiff and locked up Palmore. Doc. 1 at 8. Otherwise, Plaintiff claims that he would have been placed in lockup for months until they transferred him. Doc. 51 at 8. Plaintiff states that, after he was released from segregation for his disorderly conduct sanction, had Harris and Carlton "followed procedures, not let Palmore out of lockup early and 'made' me sign a living agreement I wouldn't [have] been forced to go back to lock up for no reason. Palmore would [have] stayed in lock up and I wouldn't [have] had to live in fear of being hurt again for the next year until I was ultimately transferred . . . ." Doc. 51 at 10. Plaintiff argues that Thomas, Carlton, and Harris are liable as supervisors because, if the prison officers had been better trained and supervised, they would have followed the regulations, an officer would have been stationed in the appropriate locations, and Palmore would not have been able to enter, unauthorized, into Plaintiff's inadequately monitored dorm. Doc. 51 at 9.

Thomas, who was the ADOC Commissioner, has no personal knowledge of the May 31, 2014 assault on Plaintiff, and Plaintiff makes no specific allegations against Thomas. Doc. 42-1 at 1. Thomas acknowledges that "there was a shortage of security staffing at Ventress during [his] tenure as Commissioner," but maintains that "staffing was managed at adequate levels to ensure safety and security. Regardless of that, incidents do occasionally occur." Doc. 42-1 at 1–2. Thomas states that, in Plaintiff's case, an attacker "seized an opportune time to engage in an act of violence in an unauthorized area. This did

18

not occur as a result of my indifference to the welfare of Jacoby or any other inmate." Doc. 42-1 at 2.

Warden Carlton also has no personal knowledge of the May 31, 2014 incidents, but he was notified about them through Duty Officer and Incident Reports. Doc. 42-3 at 1. Carlton states that he did not receive reports from Plaintiff before May 31, 2014, that Plaintiff feared Palmore, and that he "do[es] not recall receiving any request slips from the Plaintiff regarding inmate Kenneth Palmore." Doc. 41-3 at 1. Carlton "do[es] not recall any phone conversation with Plaintiff or anyone representing themselves to be Plaintiff's lawyer," and his policy was to refer calls from lawyers to the ADOC Legal Division. Doc. 41-3 at 1. Like Thomas, Carlton acknowledges that there was a shortage of security staffing at Ventress but maintains that staffing was managed at adequate levels to ensure safety and security despite the occasional incident. Doc. 41-3 at 2. Similarly, Carlton states that Palmore seized an opportunity in an unauthorized area to act violently, and Carlton denies that the incident occurred because of his indifference to the welfare of Plaintiff or any other inmate. Doc. 41-3 at 2. Carlton does not address Plaintiff's claims regarding the living agreement.

Captain Harris received no verbal or written complaint from Plaintiff concerning his allegations. Doc. 24-5. Harris does not address Plaintiff's claims regarding the living agreement or training officers.

Captain Cargle confirms that she was the On-Call Duty Official on May 31, 2014. Doc. 42-6. Cargle states that, at about 11:00 a.m., "Palmore was processed into Segregation

Cell F2-1A, pending disciplinary action for Assault on another inmate." Doc. 42-6. Cargle, who apparently also was on call for the earlier incident that led to Palmore's move to different dorm, does not address the earlier incident on May 31, 2014.

Gordon, who was the PREA Compliance Manager, interviewed Plaintiff on June 3, 2014. Doc. 42-5. Gordon concluded that Plaintiff's allegations against Palmore were "unsubstantiated," and Gordon asked the Investigations and Intelligence Division to "conduct an investigation to determine the final disposition." Doc. 42-5 at 2. Gordon also requested that Palmore be listed as Plaintiff's enemy, and that one of the inmates be transferred to a different facility. Doc. 42-5 at 2. Gordon noted that Palmore had two previous PREA complaints against him while at Easterling. Doc. 42-5 at 3. Attached to Gordon's affidavit is an unsigned, three-page ADOC Inmate Sexual Offense Data Work Sheet that Gordon prepared as a result of the two May 31, 2014 incidents. Doc. 42-5 at 2–6.

### 3.    Discussion—Failure to Protect

"A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer v. Brennan*, 511 U.S. 825, 844–45 (1994) (internal quotation marks and citations omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. Officials responsible for prison inmates may be held liable under the Eighth Amendment

20

for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and with that knowledge disregards the known risk by failing to take reasonable measures to abate it. *Id.* at 828. "Within [a prison's] volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of . . . the prison staffs and administrative personnel. . . . They are [also] under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). The Eleventh Circuit has, however, stressed that a "prison custodian is not the guarantor of a prisoner's safety." *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990); *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313 (11th Cir. 2005) (same). "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001)).

The law is settled that both objective and subjective elements are necessary components of a violation of the protections afforded by the Eighth Amendment. *Caldwell*, 748 F.3d 1099. With respect to the objective elements of a deliberate indifference claim, an inmate must first show that "an objectively substantial risk of serious harm" existed. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d at 1028–29. As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

21

and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837–38. The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, [providing security for inmates], or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately" and on the basis of what that person knew at the time of the incident. *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted). "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*; *see also Harris v. Prison Health Servs.*, 706 F. App'x 945, 951–52 (11th Cir. 2017) (recognizing conflicting

22

circuit precedent on deliberate indifference standard, but concluding the controlling standard is "more than mere negligence" not "more than gross negligence") (citing *Melton v. Abston*, 841 F.3d 1207, 1226 n.2 (11th Cir. 2016)). Thus, a prison official may avoid Eighth Amendment liability for failure to protect an inmate in any one of three ways: (1) by demonstrating that the official was not aware "of the underlying facts indicating a sufficiently substantial danger" and was "therefore unaware of a danger"; (2) by admitting awareness of "the underlying facts" of a substantial danger, but "believ[ing] (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) by showing that the official "responded reasonably" to a known substantial danger, "even if the harm ultimately was not averted." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 618 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844) (internal quotation marks omitted).

Consequently, to proceed beyond the properly supported motion for summary judgment filed by Defendants, Plaintiff must provide evidence that an objectively substantial risk of serious harm existed toward him from his attacker and that Defendants disregarded that known risk by failing to respond to it in an objectively reasonable manner. If he establishes these objective elements, Plaintiff also must satisfy the subjective component. To do so, Plaintiff must submit evidence showing that Defendants subjectively knew that Plaintiff faced a substantial risk of serious harm—that is, Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they drew the inference. *See Caldwell*, 748 F.3d at 1099–1100 (quoting

*Farmer*, 511 U.S. at 837).

It is unclear from the record who, specifically, gave the order to move Palmore to another dorm instead of segregate him, although Cargle was the officer on duty that day. In any event, based on this record, the decision to move Palmore to a different dorm pending the investigation was, at the time the decision was made, an adequate response to the threat of harm to Plaintiff. At that point, Plaintiff had reported that Palmore, who had twice been the subject of PREA complaints at another institution, sexually harassed him by following him and trying to get into a relationship with Plaintiff, and had taken his property, making him scared of Palmore. However, Plaintiff did not articulate more specific concerns about his safety or indicate that physical violence was imminent. Defendants nevertheless moved Palmore to a different dorm and initiated a PREA investigation. Without knowing more specific information about the potential threat, the decision to move Palmore to a different dorm was, at worst, a negligent assessment and response, not an Eighth Amendment violation. *See Brown*, 894 F.2d at 1537. It is not enough that Palmore was known as a violent inmate. *E.g.*, *Carter v. Galloway*, 352 F.3d 1346, 1349–50 (11th Cir. 2003) (finding no genuine issue of fact as to whether officials were subjectively aware of substantial risk of injury where plaintiff's cellmate had history of disobedience and violence, "acted crazy, roaming his cell like a 'caged animal,'" and said plaintiff would help him "fake a hanging" "one way or another"). In addition, overcrowding alone is not unconstitutional. *See Laube v. Haley*, 234 F. Supp. 2d 1227, 1245 (M.D. Ala. 2002) (discussing overcrowded conditions that amounted to constitutional

violation). The record does not indicate that the dorm had such a high incidence of violence as to put Plaintiff at a substantial risk of injury. *E.g., Cottone*, 326 F.3d at 1359 (noting clearly established law that "a lack of monitoring and supervision of known violent inmates, which led to inmate-on-inmate violence, constituted impermissible unconstitutional conduct); *LaMarca v. Turner*, 995 F.2d 1526, 1537 (11th Cir. 1993) (finding prisoner presented sufficient evidence of deliberate indifferent when, among other things, officers knew inmates were using drugs and knives, some officers profited from contraband, staff vacancies were high and morale was low, incidents of violence against inmates were not investigated, and officers were supposed to patrol dorms regularly but did not). Moreover, there is not a genuine dispute on this record that any of the Defendants made the decision to move Palmore despite knowing the substantial danger he posed to Plaintiff. *See Rodriguez*, 508 F. 3d at 618.

Turning to the second, more serious incident, and viewing in the evidence in the light most favorable to Plaintiff, the most significant lapse concerns Spann. According to Plaintiff, it was Spann who left the doors unlocked, and it was Spann who watched Palmore walk past him and into Plaintiff's living area. However, even viewed in the light most favorable to Plaintiff, nothing in the record suggests that Spann had knowledge of the earlier incident or that Spann knew about the particular threat that Palmore posed to Plaintiff. Spann's failure to secure the dorms, even assuming it did occur, "while no cause for commendation," was negligence at worst and not sufficient to create a triable question as to whether Spann was aware of facts from which an inference could be drawn that a

substantial risk of harm to Plaintiff existed, and that Spann drew the inference. *See Farmer*, 511 U.S. at 837–38 & 844. The other defendants were not present when Palmore left his dorm, entered Plaintiff's dorm, and attacked Plaintiff. The record does not suggest that they knew of facts from which an inference could be drawn that Plaintiff faced a risk of substantial harm, that they drew the inference, and that they nevertheless reacted in an objectively unreasonable manner to the risk. *Cf. Marsh*, 268 F.3d at 1028–29 (holding prisoners adequately alleged facts showing officials acts violated clearly established law). Plaintiff does not meet his burden to show a genuine dispute as to whether Defendants committed a constitutional violation regarding the assault on May 31, 2014, and therefore they are entitled to qualified immunity. *See Crosby*, 394 F.3d at 1332.

Finally, Harris and Carlton are entitled to judgment as a matter of law on Plaintiff's deliberate indifference claim that he was "forced" to choose between signing a living agreement or staying in lockup while Palmore was released.[5] It is undisputed that Plaintiff was not harmed after the earlier assault. Officers were not deliberately indifferent to Plaintiff's safety in seeking assurances that he could live peacefully with Palmore. And giving Plaintiff the option of staying in segregation or signing an agreement that he could live peacefully with Palmore was not equivalent to forcing Plaintiff to sign it. If Harris and Carlton erred in asking Plaintiff to choose between signing the living agreement or living in a more secure classification, the error did not rise to the level of deliberate indifference

---

[5] Plaintiff raises a related claim that allowing Palmore out of lockup while forcing Plaintiff to go into lockup if he did not sign a living agreement violates due process. The court addresses this issue below.

to a substantial risk to Plaintiff's safety. Finally, even assuming it did, the law was not clearly established on May 31, 2014 that doing so violated the Eighth Amendment, and therefore they are entitled to qualified immunity. *See Gaines*, 871 F.3d at 1208–10; *cf. Swain v. Peterson*, 2016 WL 8603657, at *7 (N.D. Ala. Dec. 21, 2016) ("[Plaintiff's] willingness to sign the Living Agreement gave the defendants at least some assurance that the danger had passed. Whether their action in getting [Plaintiff] to sign the Living Agreement was enough [to ensure safety] raises only a question of negligence, not deliberate indifference."), *adopted*, 2017 WL 1076452 (N.D. Ala. Mar. 22, 2017).[6]

## E.   Due Process

Plaintiff complains that he received a disciplinary report for being loud and disorderly with Palmore when instead Plaintiff was having a panic attack. Doc. 1 at 7. Plaintiff received 30 days of segregation for this incident, and maintains that "Scott had no business doing [his] hearing as she was working the night he reported Palmore to the D.O.C. Officers." Doc. 1 at 7. Plaintiff claims that he never received a response to his appeal and was placed in lockup and made to "sign a Living Agreement just to get out," while Palmore was returned to lockup to finish serving his sanction.[7] Doc. 1 at 7.

Defendants argue that Plaintiff's due process challenge is due to be dismissed. Doc. 24 at 1 n.1. Carlton "do[es] not recall any phone conversations with Plaintiff or

---

[6] Because summary judgment is due to be entered in Defendants' favor on this claim, the court does not address their remaining argument based on 42 U.S.C § 1997e(e).

[7] The court addressed the living agreement in relation to Plaintiff's claim of deliberate indifference to his safety above.

anyone representing themselves to be Plaintiff's lawyer." Doc. 42-3 at 1. In addition,

Carlton's policy was to refer calls from lawyers to the ADOC Legal Division. Doc. 42-3

at 1. Harris does not address the living agreement in her affidavit. Doc. 24-5.

There is no constitutional liberty interest in avoiding a transfer to more adverse

conditions of confinement. *See Sandin v. Conner*, 515 U.S. 472, 485–86 (1995). A prisoner

has a right to due process in two instances:

> The first is when a change in the prisoner's conditions of confinement is so
> severe that it essentially exceeds the sentence imposed by the court. The
> second situation is when the state has consistently bestowed a certain benefit
> to prisoners, usually through statute or administrative policy, and the
> deprivation of that benefit imposes atypical and significant hardship on the
> inmate in relation to the ordinary incidents of prison life.

*Morales v. Chertoff*, 212 F. App'x 888, 890 (11th Cir. 2006) (quoting *Kirby v. Siegelman*,

195 F.3d 1285, 1290–91 (11th Cir. 1999)).

If Plaintiff intends to assert a due process right based on a state-created liberty

interest in avoiding discipline for disorderly conduct, his 30 days in segregation did not

impose an "atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life" that gives rise to a protected liberty interest. *See id.* at 484; *Rodgers

v. Singletary*, 142 F.3d 1252, 1253 (11th Cir. 1998) (holding that two months in

administrative segregation did not trigger due process right under *Sandin*). Plaintiff also

fails to create a genuine dispute as to whether prison officials denied him due process in

moving him to lockup after he served his disciplinary sanction. Plaintiff does not properly

invoke *Kirby* because he fails to show how long he stayed in lockup while Palmore was

out or what the conditions were like, does not identify a statute or regulation that gives him a liberty interest, and does not explain how the alleged deprivation imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life. *See Kirby*, 195 F.3d at 1290–91; *Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994) (holding that the Constitution affords no liberty interest in a prisoner's custody classification); *cf. Meachum v. Fano*, 427 U.S. 215, 224–26 (1976) (holding that a prisoner does not have a liberty interest in assignment to any particular prison, regardless of whether the conditions of one prison are decidedly more disagreeable than another). Summary judgment is therefore due to be granted in Defendants' favor on Plaintiff's due process claim.

## F.   Supervisory Liability

Defendants Harris, Thomas, Carlton, Scott, Gordon, and Cargle argue that Plaintiff may not recover against them based on a theory of supervisory liability. Docs. 24 at 10–12 & 41 at 1. "In light of the Court's determination that there was no constitutional deprivation, there is no basis for supervisor liability." *Nam Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1283 (11th Cir. 2017). To the extent Plaintiff seeks to hold a defendant liable simply because of his or her supervisory position, supervisory personnel cannot be liable under § 1983 for a constitutional violation by their subordinates via a theory of *respondeat superior* or on the basis of vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding that doctrine of *respondeat superior* is inapplicable to § 1983 actions); *see also Cottone*, 326 F.3d at 1360. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556

U.S. at 677. Thus, liability for actions of correctional officials could attach to a supervisory defendant only if he or she "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

Scott, Cargle, and Gordon were personally involved in the incidents, but summary judgment is due to be granted in their favor for the reasons discussed above. Thomas, Carlton, and Harris did not personally participate in or have any direct involvement with the claims that are the basis of Plaintiff's complaint regarding his failure to protect claim. Thus, they can be held liable for actions of other correctional officials only if their actions bear a causal relationship to the purported violations of Plaintiff's constitutional rights. To establish this causal connection, Plaintiff must present sufficient evidence that would be admissible at trial of "a history of widespread abuse [that] put[] [the supervisory defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so," "a . . . custom or policy [that] result[ed] in [violation of his] constitutional rights," or "facts [that] support an inference that [the supervisory defendants] directed the [supervised defendants] to act unlawfully, or knew that [they] would act unlawfully and failed to stop them from doing so." *Id.* (citations omitted). A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Plaintiff has not met this burden.

The record before the court contains no evidence to support an inference that the supervisory defendants directed correctional officials to act unlawfully or knew that they

would act unlawfully and failed to stop them. In addition, Plaintiff presents no evidence of obvious, flagrant, or rampant abuse of a continuing duration in the face of which the supervisory defendants failed to take corrective action. Finally, the challenged actions did not occur pursuant to a custom or policy enacted by the supervisory defendants. Thus, the required causal connection does not exist between the challenged actions of correctional officials and their supervisors, and liability under the custom or policy standard is not warranted. Based on the foregoing, summary judgment is due to be granted in favor of the supervisory defendants on Plaintiff's claims for relief based on *respondeat superior*.

### IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      Defendants' motion for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of Defendants.

3.      This case be DISMISSED with prejudice.

4.      The costs of this proceeding be taxed against Plaintiff.

It is further ORDERED that on or before **August 2, 2018,** the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in

the Magistrate Judge's report shall bar a party from a de novo determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 19th day of July, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE